IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

DANIEL M. OLSON,

                         Plaintiff,                         OPINION and ORDER

        v.                                                          22-cv-562-wmc

SAUK COUNTY, et al.,

                         Defendants.

Plaintiff Daniel M. Olson, who is representing himself, filed this lawsuit against 59 defendants asserting 20 different claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 42 U.S.C. § 1983, and state law, based on alleged events during his two-year tenure as corporation counsel for defendant Sauk County. The 44 county defendants include current and former Sauk County board supervisors, officers, and personnel,[1] along with 8 insurance company defendants and their employees.[2] All of those defendants have filed a joint motion to dismiss this case under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. (Dkt. #89.)

---

[1] Specifically, the county defendants are Sauk County, Georgia Boehlke, Alene Klezcek-Bolin, Craig Braunschweig, Tommy Bychinski, Joel Chrisler, Ian Crammond, Ross Curry, Wally Czuprynko, Brian Desmond, Mark Detter, John Dietrich, Thomas Dorner, Lynn Eberl, Becky Evert, Mike Flint, Shane Gibson, Carl Gruber, Brent Hazard, Peter Kinsman, Rebecca Klitzke, Martin Krueger, Brandon Lohr, Valerie McAuliffe, Timothy McCumber, Richard Meister, Rob Nelson, Debra O'Rourke, Brian Peper, Dennis Polivka, Michelle Posewitz, Patricia Rego, Gary Rehfeldt, Timothy Reppen, David Riek, Delmar Scanlon, Kevin Schnell, Charles Spencer, Terry Spencer, Donna Stehling, Donald Stevens, Kristin White Eagle, Charles Whitsell, and James Witecha.

[2] The insurance defendants include Aegis Corporation, Wisconsin Counties Association, Wisconsin County Mutual Insurance Corporation, Andrew Phillips, David Bisek, Jacob Curtis, Jackson Lewis, and Ronald Stadler.

The remaining defendants are the law firms of Hawks Quindel and Von Briesen & Roper, as well as their respective employees Attorneys Colin Good, Jacob Curtis and Andrew Phillips, who have filed separate motions to dismiss largely adopting the arguments of their co-defendants and raising a few of their own.[3]  (Dkt. ##81 and 92.)  Pending before the court are also plaintiff Olson's motions:  to disqualify the Attolles law firm and Attorneys Matthew Thome and K. Scott Wagner, who are representing the county defendants (dkt. #103); for an extension to file his reply to the disqualification motion (dkt. #129); to protect ESI evidence (dkt. #138); for an extension of time to file his reply to the discovery motion (dkt. #150); to substitute Attorney Robert Kasieta for defendant Charles Spencer, who is now deceased (dkt. #156); and for a hearing and sanctions related to certain defendants (dkts. ##165 and 170).[4]

For the reasons below, the court has considered Olson's reply to the disqualification motion but will deny Olson's motion to disqualify the Attolles law firm and its attorneys and grant defendants' motions to dismiss Olson's federal RICO and § 1983 claims. Accordingly, the court will also decline to exercise supplemental jurisdiction over Olson's state law claims, and deny Olson's motions related to discovery and substitution of a party as moot.

---

[3] Former defendants Richard Cross, Benoit Letendre, and Cross, Jenks Mercer & Maffei, LLP also filed a motion to dismiss (dkt. #97), but the parties have notified the court that this motion is moot because they reached a settlement (dkt. #151 and #171).

[4] The latter motion is so general and apparently based on claims either expressly rejected in this opinion or on actions upon which this opinion renders moot.  Accordingly, this motion is deemed moot as well.

ALLEGATIONS OF FACT[5]

## A. Background[6]

In November of 2017, the county was involved in a public records lawsuit brought by the Baraboo News Record ("BNR") newspaper, seeking records that Olson alleges would reveal unfavorable conduct by the former county board chair and various other county personnel in connection with the 2016 death of C.M., an elderly disabled man who was living in unhabitable conditions in an isolated area of the county.  According to Olson, county officials had prepared two abatement orders -- Bolin issued one in 2014 and former Corporation Counsel Todd Liebman (not a defendant) issued another in 2016 -- directing C.M. to move out of his property, but Bolin, Liebman and later, Liebman's replacement, defendant Debra O'Rourke, never enforced those orders, even though they assured other county staff that they would take action.

Defendants Krueger (county board supervisor), Meister (Sauk County Sheriff), and Posewitz (Sauk County Human Resources Director), and non-defendant Renae Fry (Sauk

---

[5] In resolving the motions to dismiss under Rule 12(b)(6), the court takes all factual allegations in Olson's first amended complaint (dkt. #62) not only as true but viewed in a light most favorable to Olson, including drawing all inferences in his favor.  *Killingsworth v. HSBC Bank Nev.*, 507 F.3d 614, 618 (7th Cir. 2007).  Additionally, the court has considered the content of several documents submitted by the county defendants -- including a 2018 county board resolution, Olson's employment contract, and Olson's special report to the board -- because Olson refers to these documents in his complaint and their contents are central to his claims.  *Yassan v. J.P. Morgan Chase & Co.*, 708 F.3d 963, 975 (7th Cir. 2013) (citing *188 LLC v. Trinity Industries, Inc.*, 300 F.3d 730, 735 (7th Cir. 2002)); *Brown v. Alltran Fin., LP*, No. 18-cv-409-wmc, 2018 WL 5923772, at *2 (W.D. Wis. Nov. 13, 2018).  Olson has also not opposed defendants' argument based on these documents.  The court will discuss additional relevant facts as necessary in the analysis below.

[6] Because much of Olson's complaint is devoted to a demonstration of just how contentious local and personal politics can be, the court begins with background leading up to his appointment as corporation counsel and troubled tenure, although it does so reluctantly because these factual allegations are of limited relevance to plaintiff's factual claims.

County Administrative Coordinator) allegedly knew about the failure to follow through with these abatement orders.  Then, in December 2016, Liebman -- with the help of several of the county defendants (Bolin, Krueger, Meister, O'Rourke, Posewitz, Czuprynko, Evert, and Polivka) -- allegedly forced Fry to resign because she would not help Liebman hide the misconduct related to C.M., and further arranged for Bolin to replace her as administrative coordinator in early 2017.

Between January and November 2017, Bolin, Krueger, Posewitz and corporation counsel Liebman and then his replacement O'Rourke,[7] repeatedly blocked access to public records that BNR requested.  Further, defendant Meister allegedly intimidated BNR reporter Tim Damos by ordering armed deputies to park near his residence.  After BNR filed suit against Sauk County to obtain the records in November 2017, defendants Bolin, Krueger, O'Rourke, Posewitz, and Aegis employee David Bisek used their positions and county resources to influence the lawsuit.  Olson maintains that the actions of these defendants relating to the lawsuit were fraudulent.  He also alleges Bolin, Evert, Meister, O'Rourke, Posewitz, and others failed to disclose the above corruption to Sauk County or to Olson during his hiring process in 2018, and later obstructed Olson's authority as corporation counsel with respect to that lawsuit.

**B.  Olson's Appointment and Tenure As Corporation Counsel**

An April 2018 election allegedly created a power shift among the county board supervisors, following which County Supervisor Vedro (not a defendant) took over

---

[7] Liebman retired as corporation counsel in September 2017, and was replaced by O'Rourke, who held the position until Olson was hired.

defendant Krueger's role as leader of the board's majority.  On June 19, 2018, the Sauk County Board passed a resolution pursuant to Wis. Stat. § 59.42, appointing plaintiff Daniel Olson as the county's new corporation counsel.  Olson signed an employment agreement with the county on June 20, 2018.  As corporation counsel, he was responsible for, among other things, representing and advising the county board, other county entities and county officials on various legal matters, including on civil matters relating to their official duties as set forth at Wis. Stat. § 59.42(2)(b).

Soon after he was hired, Olson instructed minority board members that their email discussion of a proposal to oust Vedro as board chair violated Wisconsin's Open Meeting law.  According to Olson, Krueger and his allies comprising the new board minority then hatched a scheme to violate Olson's rights and eventually get rid of him.  These minority board members (including defendants McCumber, Gruber, Czuprynko, Braunschweig, Deitrich, Evert and others) also allegedly used the county email system to disparage Olson and circulate incorrect legal advice and opinions to other board members until at least January 2020.  Olson specifically offers an excerpt from an email dated February 13, 2020, authored by one of the new minority board supervisors, defendant C. Spencer, admitting the following to a county resident:

> Almost immediately [after the 2018 election,] the losing group began to use anything at hand to remove or if that was not possible to so hamper the present chair that he could not effectively do his job.

> One of the ways of doing that was to tie the chairman and the Corporation Coun[sel] together as if they were in a conspiracy together to attack their opponents and the best way to make that seem plausible was to attack them and when they defended their positions scream foul and claim it is retaliation. It worked perfectly.

(Dkt. #62, at ¶ 184.)

During the BNR lawsuit, Bisek made the unilateral and unauthorized decisions to file an interlocutory appeal and release two legal memoranda, which had been prepared by insurance counsel, to Supervisors Gruber and McCumber in January 2019.  Between January 23 and February 10, 2019, Olson emailed Bisek multiple times about the leaked BNR memoranda, and Bisek shared these confidential emails with Gruber, who along with McCumber, Boehlke, Bolin, Crammond, O'Rourke, Posewitz, and others, allegedly began to investigate Olson's door swipe, timesheet, legal service request, personnel, and payroll records.  Nonetheless, Olson's first performance review was in July 2019, and the Executive and Legislative ("E&L") Committee, which has primary supervisory authority over Olson as corporation counsel, approved Olson's continued employment on July 3, 2019.  However, Gruber, McCumber, and others continued to investigate Olson, allegedly in an attempt to hide their own misconduct and abuse of public authority.

The BNR lawsuit settled in May 2019, with an agreement that the county perform an electronic records search using proposed search terms, which Olson allegedly began in June 2019.  While reviewing emails to comply with the settlement agreement in the public records lawsuit in the second half of 2019, Olson alleges he discovered evidence of wrongdoing by certain board supervisors and county staff.  He requested a meeting with the E&L Committee to share his findings of alleged misconduct, as well as his views that

Gruber and McCumber were committing misconduct by investigating him.  The E&L Committee scheduled a closed session for January 7, 2020, at which the committee decided to support Olson's request that the past alleged corruption be investigated.

### C. Olson's Suspension and Subsequent Termination

On December 11, 2019, the day after Olson shared his report with the E&L Committee, McCumber filed a public records complaint against Olson that was quickly dismissed.  In addition, on December 12 and 13, 2019, McCumber and an unknown person filed anonymous complaints against Olson using the county's internal complaint system called "Lighthouse,"[8] making false accusations about Olson's habitual tardiness, abuse of leave time, and inadequate performance.  In response, Olson authorized Sauk County's insurance provider, Wisconsin County Mutual Insurance Corporation ("WCMIC"), on or about December 14, to select an attorney (later named as defendant Stadler) to conduct an initial inquiry and review of the Lighthouse complaints on his behalf.  Then on December 17, 2019, Gruber and McCumber both filed public records complaints against Olson with the Wisconsin Department of Justice, accusing him of misconduct and having a conflict of interest.  Olson also alleges that several defendants, including seven lawyers, repeatedly accused him of misconduct, including a mass email sent to the county board and department heads by defendant Bolin and Witecha as county

---

[8] Olson alleges that Sauk County had adopted the "Lighthouse Complaint Policy" in February 2018 "to provide an avenue for employees to raise concerns [with] and reassurance that they will be protected from reprisals or victimization for whistleblowing in good faith."  (Dkt. #62, at ¶ 223.)

supervisors on December 20, 2019, identifying Olson as the target of the Lighthouse complaints.

On January 8, 2020, McCumber circulated a petition asking for a board meeting to discuss placing Olson on administrative leave and appointing an interim corporation counsel.  This resulted in various accusations against Olson and infighting among the board of supervisors, county staff, and the outside counsel, with the board chair refusing repeated requests from various board members to place the item on the agenda for January 21, 2020. Meanwhile, on January 16, 2020, defendant Witecha -- who was the individual proposed to be the new interim corporation counsel -- threatened to reveal false, secret information about Olson if he did not resign his position as corporation counsel.  Just before the board meeting on January 21, 2020, Olson sent his own investigation request to the Wisconsin Department of Justice and the Sauk County District Attorney, making over 30 allegations of criminal misconduct and ethics violations by various county board supervisors and officials.

At the January 21, 2020, board meeting, various members called for a special meeting.  Between January 21 and 28, 2020, additional complaints were lodged about Olson's conduct, and at the January 28, 2020, special meeting, 15 supervisors voted to suspend Olson with pay until the Lighthouse investigation was completed.  Olson claims that the meeting was illegal and his suspension was not authorized under his employment contract.  He also claims that after he was suspended on January 29, 2020, Sheriff Meister posted armed deputies to guard the entrance to the corporation counsel offices, and the

county clerk provided a statement to the newspaper referencing safety concerns with respect to Olson.

Infighting and complaints among the board of supervisors regarding Olson's suspension and his allegations against county supervisors and staff continued throughout early February 2020.  On February 12, 2020, Olson filed a mandamus petition in state court, naming the county as a defendant and seeking an order to overturn the suspension vote and restore his workplace privileges.  On February 18, 2020, Olson sent a letter to the board chair, disputing various claims against him.

In March 2020, lawyers for the county communicated to Olson that they had been charged with the termination of his employment and offered him his severance payment if, as required by the contract, Olson released his claims against the county.  Olson rejected the offer, claiming that there was no vote to terminate him in effect at that time.  A special board meeting was held on May 5, 2020, at which the board then unanimously voted to terminate Olson's appointment.  Olson alleges that this meeting, too, was improperly noticed and the vote was unlawful.  Under the terms of Olson's employment contract, the county again offered Olson three months of severance pay if he released any potential claims against the county, which Olson also refused.

OPINION

## I.  Motion to Disqualify Attorneys Representing County Defendants

In considering a motion for disqualification, this court looks to the Wisconsin Supreme Court Rules of Professional Conduct for Attorneys ("SCRs").  *Fabick, Inc. v. Fabco Equip., Inc.*, No. 16-cv-172-wmc, 2016 WL 5718252, at *2 (W.D. Wis. Sept. 30, 2016)

(citing *Diettrich v. Nw. Airlines, Inc.*, 168 F.2d 961, 964 (7th Cir. 1999)).  In turn, the SCRs are based on the ABA's Model Rules.  *Id.* (citing Wis. Supreme Ct. Order No. 04-07 (Jan. 5, 2007) (available at https://docs.legis.wisconsin.gov/ misc/sco/136.pdf); *E2Interactive, Inc. v. Blackhawk Network, Inc.*, No. 09-cv-629-slc, 2010 WL 1981640, at *4 (W.D. Wis. May 17, 2010) (describing state and federal ethical rules as "essentially identical")).

Olson moves to disqualify Attolles Law and two of its attorneys, Thome and Wagner, on the ground that their joint representation of 52 government and non-government clients violates three American Bar Association's ("ABA") Model Rules of Professional Conduct 1.7 (or SCR 20:1.7), 1.11(c) (or SCR 20:1.11(c)), and 1.13(g) (or SCR 20: 1.13(g)), and what he terms the federal "common interest" rule.  Attolles argues that Olson's motion must be denied because he filed it too late, lacks standing to assert the ethical violations raised in his motion, and fails to satisfy the requirements for disqualification.  While Olson has not necessarily waived his right to bring his motion, it must be denied for lack of standing and failure to meet the stringent requirements for disqualification.  *See Freeman v. Chi. Musical Instrument Co.*, 689 F.2d 715, 721-22 (7th Cir. 1982) (Attorney disqualification is a "drastic measure which courts should hesitate to impose except when absolutely necessary," and "should be viewed with extreme caution for they can be misused as techniques of harassment."); *E2Interactive, Inc. v. Blackhawk Network, Inc.*, No. 09-cv-629-slc, 2010 WL 1981640, at *4 (W.D. Wis. May 17, 2010) ("[T]he moving party bears the heavy burden of proving facts required for disqualification.").

### A.  Standing

Only a current or former client generally has standing to seek disqualification of an attorney from a matter pending before a court because the conflict rules are designed to protect the interests of those harmed by conflicting representations rather than serve as a procedural weapon of a party opponent.  *Mills v. Hausmann-McNally, S.C.*, 992 F. Supp. 2d 885, 891 (S.D. Ind. 2014); *Foley-Ciccantelli v. Bishop's Grove Condo. Ass'n, Inc.*, 2011 WI 36, ¶¶ 69-71, 333 Wis. 2d 402, 437-38, 797 N.W.2d 789, 806-07.  Therefore, Olson lacks standing because he is neither a current nor former client of any Attolles attorney and has not identified how their representation of the county harms him personally.  *See Dupree v. Hardy*, 859 F.3d 458, 463 (7th Cir. 2017) (party does not have standing to disqualify county attorneys because he could not show that their representation of county harmed him in any way).

While there is a narrow exception to the standing rule in cases where prior representation is likely to affect the just and lawful determination of the non-client party's position, *Mills*, 992 F. Supp. 2d at 891 and *Foley-Ciccantelli*, 2011 WI 36, ¶ 71, Olson has not shown that the fairness of the adversarial process is compromised by Attolles continued representation of the county and insurance defendants.  Even though Olson suggests that counsel are breaching their fiduciary duty to the public by facilitating ethics violations by other lawyers, he is not basing his motion on any *actual* attorney-client conflict, but instead on Sauk County's *possible* interests in corruption -- specifically his allegations of a broad-based RICO conspiracy -- for which he fails to state a claim under RICO for the reasons discussed below.  *Mills*, 992 F. Supp. 2d at 894 (opposing party cannot justify motion to

disqualify primarily on basis of other party's interests); *Brannan v. Clinton Cnty. Bd. of Comm'rs*, No. 16-cv-585, 2016 WL 6277664, at *3 (S.D. Ind. Oct. 27, 2016) ("The Court sees no basis for concluding that the fair and efficient administration of justice would be harmed because Brannan's motion relies only on Defendants' possible interest rather than an actual attorney-client conflict.").  Even considering this possible exception, therefore, Olson plainly lies outside the protective scope of the conflict rules and lacks standing to bring a disqualification motion.  Even if some argument for standing existed as to any of his disqualification claims, he plainly lacks standing as to most grounds for the reasons explained more specifically below, while the remainder lack any merit on their face.

## B. Requirements for Disqualification

Even if Olson had standing, the court can find no merit in his assertion of conflict.  To begin, SCR 20:1.7(a) provides that an attorney "shall not represent a client if the representation involves a concurrent conflict of interest," which "exists if:  (1) the representation of one client will be directly adverse to another client; or (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer."  However, notwithstanding the existence of a concurrent conflict of interest, "a lawyer may represent a client if:  (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client; (2) the representation is not prohibited by law; (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and (4) each affected

12

client gives informed consent, confirmed in a writing signed by the client."  SCR 20:1.7(b).

Relatedly, the common interest (or joint defense) doctrine is an exception to the attorney-client privilege that allows separately represented parties with common legal interests to share privileged information with each other and their respective attorneys without destroying the attorney-client privilege.  *See Gerba v. Nat'l Hellenic Museum*, 338 F. Supp. 3d 851, 859 (N.D. Ill. 2018) (internal citations omitted); *Attorney-Client Privilege: Common Interest Doctrine (Federal),* Practical Law Practice Note w-023-6233.

Olson argues that the law firm and Thome and Wagner have three impermissible conflicts of interest:  (1) two current Attolles attorneys -- Phillips and Curtis -- are defendants, making the law firm and all of its attorneys "de facto" defendants; (2) Attolles' representation of defendant Wisconsin Counties Association is critical to the law firm's financial success; and (3) the substantive and procedural interests of every individual Attolles client are adverse to Sauk County's interests in eliminating corruption elimination and seeking restitution for RICO violations.  With respect to the third conflict in particular, Olson contends that the 52 Attolles clients do not share a sufficient "common interest" to permit joint representation by the same lawyers, and relies on *Young v. United States ex rel. Vuitton et Fils S. A.*, 481 U.S. 787 (1987), to assert that there is an "inherent conflict in roles" between public government interests and private individual interests.  However, *Young* is not dispositive or instructive in this case because it involved the potential conflicts of interest of counsel appointed to undertake a criminal contempt prosecution.  *See id*. at 790 & 807 (district court erroneously appointed respondent's attorneys, rather than disinterested attorney, to prosecute violation of injunction).  Indeed, courts have rejected

attempts to extend *Young*'s *criminal* conflict-of-interest protections to civil matters and instead apply the Rule 1.7 standard.  *See, e.g., U.S. ex rel. Kelly v. Boeing Co*., 9 F.3d 743, 759-760 (9th Cir. 1993) (declining to extend *Young* to qui tam relators in False Claims Act case); *Davis v. Southern Bell Tel. & Tel. Co*., 149 F.R.D. 666, 679-80 (S.D. Fla. 1993) (applying Rule 1.7 and not *Young* to antitrust class action civil suit involving potential conflicts created by class counsel's representation of government and private interests).

Next, Olson argues for disqualification of counsel based on Rule 1.11(c), which governs a lawyer's knowledge of confidential government information acquired while the lawyer was a public employee.  In support, Olson points to two confidential investigation reports that three Attolles Attorneys (Phillips, Curtis, and Rebecca Roeker) obtained while employed by the law firm of Von Briesen & Roper, which was appointed to serve as interim corporation counsel between June 2020 and mid-March 2021.[9]  Olson claims these reports are confidential because they are not publicly available.[10]

As an initial matter, it is unclear whether Olson has standing to rely on Rule 1.11(c) as a basis for disqualification because it is not clear that the reports he identifies contain any confidential information about *him*.  Moreover, even if Olson does have standing, Rule 1.11(c) would not apply because the Attolles attorneys are not taking advantage of information *they* learned through their prior government service; rather, the reports were

---

[9] In an affidavit in support of his motion, Olson avers that the reports included the Lighthouse investigation report prepared by Stadler and a confidential employment grievance report prepared by Attorney Oyvind Wistrom.  (Dkt. #105, at ¶ 4.)

[10] Attolles has produced evidence showing that Attorney Curtis previously denied Olson access to the reports on the ground that they are privileged attorney-client and work product communications between the county and its attorneys.  (*See* dkt. #121-1.)

prepared by their client, Sauk County, and the county's previous counsel, which included defendants Curtis and Phillips, and are available to all of the Attolles clients by virtue of the firm's joint representation of Sauk County and the individual defendants. While Olson argues that Attolles' joint representation of 52 clients is not valid, the court disagrees for reasons already discussed and further explains below.

Finally, Olson invokes Rule 1.13(g), which states that a "lawyer representing an organization may also represent any of its directors, officers, employees, members, shareholders or other constituents, subject to the provisions of SCR 20:1.7." Olson contends that Attolles' representation of *both* Sauk County *and* at least some defendants who are not directors, officers, employees, members, shareholders, or other constituents of Sauk County violates this rule. Again, Olson is not a former or current client of Attolles and lacks standing to assert the interests of the various defendants represented by Attolles. Moreover, Olson provides no authority for his assertion that Rule 1.13(g) *prohibits* joint representations, including an organization and others who are not officials or constituents of that organization. Indeed, that authority appears to contemplate that an attorney can represent both a government agency and a private party, which is inconsistent with Olson's interpretation of Rule 1.13(g). *See* SCR 20:1.11, ABA cmt. 9 ("Paragraphs (a) and (d) do not prohibit a lawyer from jointly representing a private party and a government agency when doing so is permitted by Rule 1.7 and is not otherwise prohibited by law."); *see also Coleman v. Smith*, 814 F.2d 1142, 1146-1148 (7th Cir. 1987) (discussing joint representation of Village and *former* mayor and police chief). Accordingly, Olson has failed to meet his burden of showing that Attolles Law, Thome, and Wagner must be disqualified.

15

## II. Motions to Dismiss

This brings the court to defendants arguments for dismissal of this action, both in its entirety and as to particular claims and defendants, and for failure to state a claim.  The court will first discuss Olson's RICO claims and then address his numerous § 1983 claims.  Because the court concludes that Olson cannot state a federal claim for relief against any of the defendants, it is unnecessary to analyze Olson's state tort claims, over which the court declines to exercise supplemental jurisdiction.

### A. RICO

The RICO statute makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt," 18 U.S.C. § 1962(c), and "to conspire" with others to do so, 18 U.S.C. § 1962(d).  As an initial matter, the Supreme Court has repeatedly emphasized that RICO was enacted in response to "long-term criminal conduct," not isolated or sporadic unlawful activity.  *Shibilski v. Moss*, No. 20-cv-666-wmc, 2021 WL 325873, at *4 (W.D. Wis. Feb. 1, 2021) (citing *H.J., Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240-41 (1989); *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 n.14 (1985)).  To that end, the Seventh Circuit and other federal courts of appeals expressly discourage "converting garden-variety common law claims into a RICO violation."  *Id.* (citations omitted).  Specifically, to allege a civil RICO claim, Olson must show:  (1) conduct (2) of an enterprise engaged in or the activities of which affect interstate or foreign commerce (3) through a pattern (4) of racketeering activity.  *Sabrina Roppo v.*

16

*Travelers Commercial Ins. Co.*, 869 F.3d 568, 588 (7th Cir. 2017) (quoting *Vicom, Inc. v. Harbridge Merchant Services, Inc.*, 20 F.3d 771, 778 (7th Cir. 1994)); *United States v. Muskovsky*, 863 F.2d 1319, 1325 (7th Cir. 1988). "Racketeering activity" is any predicate offense listed in 18 U.S.C. § 1961(1), including crimes such as bribery, extortion, fraud, money laundering, or drug trafficking; and two or more related, predicate acts are required to show a pattern of racketeering, 18 U.S.C. § 1961(4); *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 336 (7th Cir. 2019).

Defendants challenge Olson's RICO claims on the grounds that he has failed to allege any plausible connection or affect on interstate commerce, actionable predicate acts, or causal connection between the alleged racketeering and the damages he suffered, which deprives him of standing. Further, while the threshold for satisfying the interstate commerce requirement is quite low,[11] *Goddess & Baker Wacker L.L.C. v. Sterling Bay Companies, LLC*, 592 F. Supp. 3d 746, 757 (N.D. Ill. 2022), it is not necessary for the court to resolve this issue because it concludes, for the reasons discussed below, that Olson has failed to plead a foundation of predicate acts comprising a pattern of racketeering that led to his alleged injury of termination.

---

[11] Generally, the type of municipal corruption that Olson alleges is insufficient to establish the requisite nexus with interstate commerce, *see CivCon Servs., Inc. v. Accesso Servs., LLC,* No. 20-cv-1821, 2020 WL 6075869, at *4 (N.D. Ill. Oct. 15, 2020). However, Olson's allegations that defendants used their income paid by Sauk County to purchase interstate goods or services may be sufficient to establish that the alleged enterprise had at least a minimal effect on interstate commerce. *See United States v. Muskovsky*, 863 F.2d 1319, 1325 (7th Cir. 1988) (defendant's use of telephone and purchase of supplies from out-of-state companies sufficient to satisfy this jurisdictional element); *Goddess & Baker Wacker*, 592 F. Supp. 3d at 757 (commerce requirement satisfied by allegations that some tenants injured by enterprise's purported extortion were headquartered in other states).

### 1.  No Set of Predicate Acts or Resulting Injury to Olson

First, Olson must properly plead a "foundation of predicate acts," *Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1327 (7th Cir. 1994), by alleging sufficient facts to establish probable cause that the defendants committed an "indictable" or "chargeable" offense.  18 U.S.C. § 1961(1); *see also Jennings v. Emry*, 910 F.2d 1434, 1438 (7th Cir. 1990) ("[I]n pleading predicate acts, conclusory allegations that various statutory provisions have been breached are of no consequence if unsupported by proper factual allegations.").  However, Olson only conclusorily alleges that between October 2016 and September 2022, defendants participated or aided in thousands of acts of mail or wire fraud, bribery, extortion, and witness tampering, which caused him lost or diminished income, benefits, occupational opportunity, and personal office property.  For the most part, Olson fails to allege with any particularity what specific conduct each defendant allegedly committed and how their actions may have constituted racketeering activity, and the conduct that he does describe in more detail does not plausibly constitute a predicate offense.  The court discusses the parties' specific arguments concerning each type of alleged criminal activity below.

### a.  Wire Fraud

The elements of wire fraud under 18 U.S.C. § 1343 are:  (1) participation in a scheme to defraud; (2) intent to defraud; and (3) use of an interstate wire in furtherance of the fraudulent scheme.  *Shibilski v. Moss*, No. 20-cv-666-wmc, 2021 WL 325873, at *7 (W.D. Wis. Feb. 1, 2021) (citing *United States v. Turner*, 551 F.3d 657, 664 (7th Cir. 2008)).  Olson does not reference a specific use of interstate communications as part of

defendants' scheme. Instead, he contends that defendants made thousands of phone calls, text messages, internet email messages, internet videos, and other "interstate commerce communications" in carrying out the numerous events described in his complaint. This is simply not enough, especially because Olson's fraud claims are subject to Rule 9(b)'s particularity requirement. *See id.* (citing *Uni*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 924 (7th Cir. 1992) ("Rule 9(b)'s particularity requirement serves an important purpose. Accusations of fraud can seriously harm a business. This is especially so in RICO cases where those accusations of fraud lead to the probably more damaging accusation that the business engaged in 'racketeering.'"). Moreover, wire communications occurring within the same state do not qualify as RICO predicate acts, *Shirley v. Jed Capital LLC*, 724 F. Supp. 2d 904, 913 ( N.D. Ill. 2010); *Arenson v. Whitehall Convalescent & Nursing Home, Inc.*, 880 F. Supp. 1202, 1212 (N.D. Ill. 1995), and there is no plausible basis for concluding that defendants, who all live and work in Wisconsin, used *interstate* wire communication as part of any scheme to defraud Olson.

### b. Bribery

Citing numerous state statutes concerning misconduct and dishonest use of discretionary authority by public officials (*see* dkt. #62, at ¶ 152(b)), Olson alleges that defendants committed bribery by collecting their publicly disclosed and approved salaries, then failing to perform their jobs honestly. However, Olson does not plausibly allege that anyone agreed to do or not do something in exchange for continuing to receive their salary, and even if there were a credible allegation to that effect, the injured party would be Sauk County, not Olson. While Olson argues that defendants agreed not to terminate each

19

other in exchange for keeping quiet, his vague allegations of bribery also "lack the factual support to constitute sufficiently alleged predicate acts;" indeed, he fails to allege *any* communication or other fact from which an illicit agreement could be inferred. *Kaye v. D'Amato*, 357 F. App'x 706, 713 (7th Cir. 2009) (finding similar). Finally, contrary to Olson's contention, no such agreement can be plausibly inferred from C. Spencer's February 2020 email concerning a plan to remove or hamper the new county board chair after the 2018 election. At most, the email describes political infighting and attacks among the board's minority and majority members, not an agreement among any defendants to condition their salaries on any particular action or inaction.

### c. Extortion

To state a claim for extortion under the Hobbs Act, Olson must show that defendants obtained property from him, with his consent, induced by "wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b). Olson contends that certain defendants committed extortion in two ways:

1) Defendants Krueger, Meister, O'Rourke, and Posewitz used their public authority to force Renae Fry to surrender her employment contract rights and associated property interests in 2016, then transferred those rights to defendant Bolin.

2) Defendant Witecha attempted to force Olson to resign his position through fear and abuse of public authority and defendant Phillips offered him three-months severance in exchange for a release of all his claims.

Neither of these events amount to extortion for purposes of RICO. *First*, Olson again lacks standing with respect to Fry's separation from employment because he does not plausibly allege that he was injured by it. Indeed, Fry's alleged constructive termination

occurred almost two years *before* Olson was even hired.  *Second*, while the alleged actions of Witecha and Phillips personally targeted Olson, neither incident deprived Olson of property that could be extorted.

The United States Supreme Court has made clear that "[o]btaining property requires not only the deprivation but also the acquisition of property," so the "property extorted must therefore be transferable -- that is, capable of passing from one person to another."  *Sekhar v. United States*, 570 U.S. 729, 734 (2013) (internal citation omitted).  Relying on this reasoning, the Seventh Circuit has held that public employment is not "property" for purposes of the Hobbs Act.  *United States v. Blagojevich*, 794 F.3d 729, 736 (7th Cir. 2015) (*Sekhar* instructs that "a job in the Cabinet (or any other public job) is not 'property' from the employer's perspective.  It is not owned by the person with appointing power, and it cannot be deeded over.  The position may be filled by different people, but the position itself is not a transferrable property interest.").  This is especially true in Olson's case here because, as discussed in conjunction with his § 1983 claims below, there is no dispute that he served at the pleasure of the board and had no right to continued employment under his contract.

### d.  Witness Tampering

Olson makes numerous other vague allegations of witness tampering, such as contending that defendants intended to influence possible testimony in a future official proceeding against them by engaging in a "vicious campaign of abuse" against Olson only a day after he first publicly disclosed their public corruption.  (Dkt. #62, at ¶ 224).  While Olson claims that defendants violated 18 U.S.C. §§ 1512(b)(1), (b)(2)(A), and (c)(2),

these statutes concern witnesses in an "official proceeding," which is limited to *federal* judicial, Congressional, or government agency proceedings or a proceeding involving an insurer whose activities affect interstate commerce, *see* 15 U.S.C. § 1515.  Because none of Olson's vague witness tampering allegations relate or could relate to any federal official proceeding, they cannot constitute a RICO predicate act.  Olson also vaguely claims that defendants' abuse of him somehow violates 18 U.S.C. §§ 1512(d)(4) and (k), but subsection (k) merely prohibits conspiracies to violate other sections of § 1512, and subsection (d)(4) relates to hindering or delaying a criminal prosecution or probation hearing, neither of which are adequately pleaded in this case.[12]

### 2.  No Pattern of Racketeering

Second, Olson's conclusory allegations about a county-wide "corruption scheme" fall far short of showing that any of the various county officials, insurance companies, and law firms named as defendants here conspired in an ongoing pattern of joint decision-making to harm *Olson* in particular.  *See Goren v. New Vision International, Inc.*, 156 F.3d 721, 730 (7th Cir. 1998) (modified on other grounds by *Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961 (7th Cir. 2000)) ("'[L]umping together' of defendants is clearly insufficient to state a RICO claim under § 1962(c)."); *Griffin*, 2019 WL 5218980, at *4 (citing *Goren* for same).  And even if Olson could allege facts showing one or more of the

---

[12] In fairness, Olson reported his concerns about defendants' past corruption to the Wisconsin DOJ, but that is obviously a *state* department and not a federal agency.  Moreover, the state officials apparently found no cause to investigate any potential criminal matter.  Finally, Olson's allegations do not plausibly suggest that defendants improperly influenced the decision not to investigate.

defendants somehow participated in some sort of pattern of criminal wrongdoing, this does not give rise to a reasonable inference that those individuals intentionally *conspired* with each other to harm Olson.[13]  *See Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) (RICO "liability depends on showing that the defendants conducted or participated in the conduct of the 'enterprise's affairs,' not just their own affairs."); *Limestone Development Corp. v. Village of Lemont, Illinois*, 520 F.3d 797, 803 (7th Cir. 2008) ("RICO cases, like antitrust cases, are 'big' cases and the defendant should not be put to the expense of big-case discovery on the basis of a threadbare claim.").

Indeed, as explained above, there is little connection between his vague allegations of widespread criminal activity and his actual termination.  Although lengthy, Olson's complaint at most alleges a state law contract or employment dispute, not the kind of long-term, *criminal* conspiracy required to state a civil RICO claim.  Therefore, Olson's claims under 18 U.S.C. §§ 1562(c) and (d) will be dismissed for failure to state a claim upon which relief may be granted.

### B. § 1983 Claims

Olson next asserts claims under § 1983 for eight alleged constitutional violations. These claims can be grouped into four categories:  (1) retaliatory suspension and termination of Olson's employment for exercising his First Amendment right to free speech

---

[13] Olson also makes vague allegations that the alleged corruption harmed all Sauk County residents, but he also lacks standing to assert claims for these alleged injuries.  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340-41 (2016) ("We have made it clear time and time again that an injury in fact must be both concrete and particularized.  . . . Article III standing requires a concrete injury even in the context of a statutory violation.").

(claim nos. 3, 5, and 6);[14] (2) a prior restraint imposed on Olson's speech after he was suspended; (3) the deprivation of Olson's substantive and procedural due process rights in conjunction with his suspension and termination (claim nos. 3, 4, and 8); and (4) the improper seizure of his personal property from his corporation counsel office after he was placed on leave (claim no. 7).[15]  Defendants move to dismiss the claims on several grounds, including that:  the claims against the Hawks Quindel and Von Briesen & Roper law firms, and the attorneys employed by them (Good, Curtis, and Phillips), fail to meet the state actor requirement; Olson's speech before or following his termination is not protected by the First Amendment; Olson has no liberty interest in his public employment or privacy interest in his corporation counsel office space; and Olson's remaining allegations of a conspiracy and a municipal policy or practice to violate his civil rights fail to state a claim because he has failed to show any underlying constitutional violation occurred.  For the reasons set forth below, the court agrees that Olson's § 1983 claims must be dismissed on one or more of these grounds raised by defendants, beginning with the threshold matter of state action, then turning to defendants' specific arguments about the sufficiency of Olson's allegations regarding each type of claim.

---

[14] As defendants point out, Olson would only be allowed to assert these claims under the First Amendment and not the substantive due process clause.  *See Alexander v. McKinney*, 692 F.3d 553, 558 (7th Cir. 2012) ("[T]he Supreme Court has made it clear that a substantive due process claim may not be maintained where a specific constitutional provision protects the right at issue.").

[15] Olson's remaining conspiracy and *Monell* claims (claim nos. 9 and 10) are derivative of his other § 1983 claims as they are based on the same alleged violations of the First, Fourth and Due Process Clause of the Fourteenth Amendments.

### 1.  State Actor Requirement

Section 1983 allows plaintiffs to sue individuals for violating their civil rights acting "under the color of state law." *Alarm Detection Systems, Inc. v. Village of Schaumburg*, 930 F.3d 812, 825 (7th Cir. 2019).  While "a private citizen can act under color of law if there is evidence of a concerted effort between a state actor and that individual," *Spiegel v. McClintic*, 916 F.3d 611, 616 (7th Cir. 2019), private attorneys and law firms who simply advise and represent public entities are not generally considered state actors for the purposes of § 1983.  *See Raines v. Indianapolis Public Schools*, 52 F. App'x 828, 830 (7th Cir. 2002) (Tarter's involvement in the dispute between Raines and the Board was limited to writing two letters on the Board's behalf); *Dyer v. Maryland State Bd. of Educ.*, 187 F. Supp. 3d 599, 614-16 (D. Md. 2016) (collecting cases and rejecting § 1983 claim by former state board member against attorneys who performed legal services in connection with his removal).

Because Olson affirmatively alleges that the board appointed defendant Von Briesen & Roper to act as corporation counsel from June 2020 to March 2021, actions taken during that period may plausibly make it a state actor.  Accordingly, the court will not dismiss claims against Von Briesen & Roper on that ground.  However, Olson's only argument that defendants Good and Hawks Quindel meet this requirement is that their client, defendant Witecha, was a government employee, which is insufficient by itself to infer that Good and Hawks Quindel were plausibly acting under the color of state law.  Indeed, Olson's limited allegations against Good and Hawks Quindel show no more than legal advocacy on the part of their client.  (*See* Amd. Cpt. (dkt. #62) at ¶ 270 (alleging Good made false

accusations against Olson in a January 23, 2020, demand letter); Demand ltr. (dkt. #83-1) (copy of letter sent by Good on behalf of his client, Witecha, "in an attempt to resolve an employment dispute").)  Accordingly, Olson's § 1983 claims against Attorney Good and Hawks Quindel must be dismissed on this ground alone.

### 2.  First Amendment Retaliation

Next, a plaintiff must allege the following to state a First Amendment retaliation claim:  (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter future First Amendment activity; and (3) the protected activity was at least a motivating factor in defendant's decision to take retaliatory action. *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009).   Here, Olson bases his First Amendment retaliation claims on the following communications and filings made before his suspension on January 28, 2020, then before his termination on May 5, 2020:

1) Reports of corruption that Olson made to Sauk County's E&L Committee on December 10, 2019, and January 7, 2020.

2) Requests for investigation of corruption that Olson made to the Sauk County District Attorney and Wisconsin Attorney General on January 21, 2020.

3) A January 28 email and January 30 demand letter Olson sent to the board in response to his suspension and his employment dispute.  (Dkt. ##91-5 (Jan. 28 email), at 2 and 91-6 (demand letter).)

4) A January 31 email and February 18 letter that Olson sent to Board Chair Vedro about his "unlawful" suspension and "lies" that Deitrich, Witecha, and other supervisors made about Olson's performance.  (Dkt. ##91-7 and 91-8.)  (The latter also discusses alleged misconduct committed by various board supervisors who allegedly retaliated against Olson.)

5) The mandamus petition Olson filed in state court on February 12, 2020, challenging the legality of his suspension. (Dkt. # 91-9.)[16]

Certainly, many of the issues raised by Olson particularly in his reports to the board, plainly involve important public concerns that may merit public scrutiny. *See Garcetti v. Ceballos*, 547 U.S. 410, 425 (2006) ("Exposing governmental inefficiency and misconduct is a matter of considerable significance."); *Fehlman v. Mankowski*, 588 F. Supp. 3d 917, 922 (W.D. Wis. 2022), *aff'd*, 74 F.4th 872 (7th Cir. 2023) (citing *Garcetti* regarding complaints brought by police officer against police chief). For a *public* employee's speech to be protected under the First Amendment, however, the employee must also show that: (1) he made the speech as a private citizen; (2) the speech actually addressed a matter of "public concern"; *and* (3) his interest in expressing that speech was not outweighed by the state's interests as an employer in promoting effective and efficient public service. *Swetlik v. Crawford*, 738 F.3d 818, 826 (7th Cir. 2013) (internal citation omitted). Defendants persuasively argue that Olson's allegations do not plausibly satisfy any of these elements, but Olson's failure to show that he can meet either of the first two requirements is dispositive, making it unnecessary for this court to engage in the balancing test regarding government interests.

---

[16] Olson also alleges that defendants retaliated against him for filing notices of breach of contract claims, investigation inquiries, and a notice of intent to sue, but all of those filings occurred after Olson was terminated in May 2020, and Olson fails to allege that he suffered any further deprivation after his termination. While Olson contends in his response brief that his complaint "plainly alleges or reasonably infers that Defendants committed an abuse of some public authority in response to all of" these post-termination communications (dkt. #112, at 21), he does not explain what that abuse was or how it could have plausibly affected him once he was no longer employed by the county.

### a. Speech as private citizen

As to the first element, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421; *see also Cage v. Harper*, 42 F.4th 734, 742 (7th Cir. 2022) ("The Supreme Court has held that the inquiry should be a 'practical one,' focusing on 'the duties an employee actually is expected to perform,' as opposed to strictly what is listed in his formal job description."). As defendants contend, Olson was plainly speaking pursuant to his official duties as corporation counsel when he made his reports to the E&L Committee and requests for investigation to state law enforcement officials (communication nos. 1 and 2 above). Indeed, Olson admits as much in his complaint and in his prepared statement to the board on December 10, 2019, speaking as the "county's lawyer." (Amd. cpt., dkt. #62, at ¶ 221; Spec. Rept., dkt. #91-3 ("I am here as the county's lawyer to simply report serious legal concerns that affect the wellbeing of my client, Sauk County").)

While Olson alleges that he was sharing his concerns about past government corruption pursuant to his "professional duty" as a lawyer and not as part of his employment as corporation counsel (dkt. #62, at ¶¶ 220-21), which did not include duties related to criminal matters, the Seventh Circuit has explained that a plaintiff at the pleading stage "cannot escape the strictures of *Garcetti* by including in [his] complaint the conclusory legal statement that [he] testified 'as a citizen . . . outside the duties of [his] employment.'" *Tamayo v. Blagojevich*, 526 F.3d 1074, 1092 (7th Cir. 2008). Regardless, the text of Olson's special report mainly addresses Olson's concerns involving disputes over

28

county employee access to confidential legal documents, compliance with open meeting laws, public comment requirements, and other unidentified, unethical conduct. (*See* dkt. #91-3.) Moreover, courts in this circuit have consistently held that reports by government employees to their superiors concerning alleged wrongdoing in their government office were within the scope of their job duties, and, therefore, the employees were not speaking as private citizens. *See, e.g., Sweet v. Town of Bargersville*, 18 F.4th 273, 278-79 (7th Cir. 2021); *Hatcher v. Bd. of Trs. of S. Ill. Univ.*, 829 F.3d 531, 539 (7th Cir. 2016), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016) ("[W]e have repeatedly held that an employee's speech about misconduct affecting an area within her responsibility is considered pursuant to her employment even when she is not strictly required to make it."); *Fehlman*, 588 F. Supp. 3d at 924 ("[T]he court of appeals has consistently held that an employee's complaints about workplace misconduct aren't protected under the First Amendment, even when the employee's express job duties didn't include a duty to report that misconduct.").[17]

---

[17] To the extent that Olson complained about corruption during his suspension from January 28 to May 5, 2020, those communications do not qualify as protected speech because Olson did not become a private citizen solely by virtue of his suspension. Indeed, even suspended employees are still employees, especially in this case where Olson was placed on administrative leave *with* pay. *See Foerster v. Bless*, No. 20-20583, 2022 WL 38996, at *5 (5th Cir. Jan. 4, 2022) (per curiam) (concluding that caselaw concerning speech by public employees fully applies to suspended employees). In any event, most of Olson's post-suspension communications do not meet the requirement for public concern for the reasons discussed consistent with the discussion of the following public concern element of plaintiff's retaliation claim.

### b. Public concern

As for the second element of a First Amendment retaliation claim, "[s]peech that concerns personal job-related matters is outside the scope of the First Amendment, even if that speech is not among the job's duties." *Wozniak v. Adesida*, 932 F.3d 1008, 1010 (7th Cir. 2019); *see also Houskins v. Sheahan*, 549 F.3d 480, 491-92 (7th Cir. 2008) ("Speech that serves a private or personal interest, as opposed to a public one, does not satisfy the standards for First Amendment protections."); *Kokkinis v. Ivkovich*, 185 F.3d 840, 844 (7th Cir. 1999) ("[S]peaking up on a topic that may be deemed one of public importance does not automatically mean the employee's statements address a matter of public concern[.]"). Thus, to the extent Olson's mandamus petition and communications to members of the board concerning the legality of his suspension and his performance as corporation counsel primarily relate to his own private employment interests, and not the exposure of government corruption, they are not protected by the First Amendment.

### 3. First Amendment Prior Restraint

Olson next alleges that defendants sent him numerous letters and emails after he was suspended on January 28, 2020, telling him to "shut up," "stand down," and "cease and desist all further communication" to Sauk County employees as corporation counsel. (Dkt. #62, at ¶¶ 312 and 373 (list of specific communications); dkt. #133-3 to -6 (copies of emails and letters discussed in amended complaint.)[18]  While Olson argues that a total

---

[18] For example, Attorney Phillips, representing the county's insurer, instructed Olson on February 5, 2020, to "refrain from any further actions related to your position as Corporation Counsel absent other direction from the County Board or a court." (Dkt. #133-4.)  And through counsel on February 25, 2020, the county board directed Olson "not to render legal advice on behalf of the County or take any other action that could be [seen] as action in your capacity as corporation

ban on any type of communication imposed by the government "is a quintessential prior restraint" (dkt. #112, at 21 n. 16), a restriction on speech qualifies as a prior restraint in the public employment context only where the employee has an interest in the speech as a citizen commenting upon a matter of public concern. *Samuelson v. LaPorte Cmty. Sch. Corp.*, 526 F.3d 1046, 1052 (7th Cir. 2008) ("[B]efore applying [prior restraint] test to [public school's guidelines] we first must determine whether that policy applies to speech that is protected by the First Amendment.").

Here. the directives and pleas that Olson received from various county employees and attorneys do not constitute prior restraints because they do not restrict any speech protected by the First Amendment.  Rather, any speech defendants sought to restrict during Olson's suspension was either grounded in his duties as corporation counsel or concerned Olson's personal interest in his continued employment. *See Samuelson*, 526 F.3d at 1052 (community school corporation's chain-of-command policy, which required staff members to consult supervisors on matters "requiring administrative attention" concerned speech grounded in teacher's professional duties).  Accordingly, Olson has also failed to state a First Amendment claim for the imposition of a prior restraint.

### 4.  Procedural Due Process

To the extent that Olson contends defendants terminated him under a process that failed to satisfy the minimum standards of fairness required by the Due Process Clause, he

---

counsel; nor are you to direct any questions or offer any direction to the County Board or its individual members."  (Dkt. #133-5.)

must allege facts showing that:   (1) he was deprived of a liberty or property interest protected by the Constitution; and (2) the procedures applied failed to satisfy the minimum constitutional requirements of fairness.  *Doe v. Purdue Univ.*, 928 F.3d 652, 661 (7th Cir. 2019).  With respect to the first element, Olson identifies his protected interests in his employment, as well as "contract benefits . . . legal claims, pension benefits, social security benefits, personal property, public office emoluments, occupational liberty, right to work, lawful conduct, privacy, reputation, or personal security."  (Dkt. #62, at ¶ 400.) However, as defendants point out, Olson was an "at will" employee throughout his tenure, and therefore, had no constitutionally protected interest in his employment as corporation counsel or the benefits that flowed from that position.  Thus, as explained below, he fails to allege a plausible occupational liberty claim.

### a.  Continued Employment

For Olson to demonstrate a cognizable property interest in his public employment, he "must be able to show . . . some legitimate expectation of continued employment," *Meade v. Moraine Valley Community College*, 770 F.3d 680, 686 (7th Cir. 2014), which generally requires "that the terms of his employment provide for termination only 'for cause' or otherwise evince 'mutually explicit understandings' of continued employment," *Cole v. Milwaukee Area Technical College Dist.*, 634 F.3d 901, 904 (7th Cir. 2011).  This expectation can arise via contractual language limiting the employer's discretion to fire the employee, *Meade*, 770 F.3d at 686, or via a statute or ordinance that provides "'some substantive criteria limiting the state's discretion,'" *Miyler v. Village of East Galesburg*, 512 F.3d 896, 898 (7th Cir. 2008).  No such circumstances have been alleged here.

To the contrary, the Wisconsin statute under which Olson was appointed, and which specifically applies to corporation counsel, Wis. Stat. § 59.42(1), expressly provides that a corporation counsel "may be terminated at any time by a majority vote of all the members of the board."  Here, Olson creatively alleges in his amended complaint and argues in his response brief that the super-majority vote requirement is unique, and that the phrase "at any time" cannot be reasonably construed to permit removal "at pleasure," but the Wisconsin Court of Appeals has expressly held that "[i]n the absence of any statute to the contrary, a municipal officer who is appointed, not for a fixed term, serves at the pleasure of the appointing officer and may be removed at any time."  *Unertl v. Dane Cty.*, 190 Wis. 2d 145, 152, 526 N.W.2d 775, 777 (Ct. App. 1994).  Nothing in § 59.42(1)(a) alters this default rule; instead, the statute makes clear that a corporation counsel may be terminated for any reason.

Moreover, the county board Resolution no. 97-18 appointing Olson provided that he would "serve at the pleasure of the county board, subject to the terms and conditions" in his employment agreement, which states that "[n]othing in this agreement shall prevent, limit or otherwise interfere with the right of the Employer to terminate the services of the Employee at any time, subject only to the provisions set forth in Section 3, paragraph A, of this agreement."  (Dkt. #9-4 and #91-11.)  In turn, Section 3.A of the employment contract states that unless Olson was terminated for willful neglect of duty, malfeasance, or misfeasance in office, the county would pay him a three-months' severance if he were to

33

be terminated, conditioned on Olson's execution of a release of any claims against the county.[19]

Olson alleges that no one discussed with him the fact that he would serve "at pleasure" or "at will"; no drafts of the contract he saw between June 12 and 18, 2018, contained those terms; and he did not review Resolution 97-18, but instead relied on his communications with defendant Bolin, the Sauk County Administrative Coordinator, and the contract terms they negotiated before signing the employment agreement on June 20, 2018. However, Olson's failure to read the resolution appointing him or the final version employment contract that he signed do not negate the provisions in each document expressly making him an at will employee, especially given his status as an attorney. Accordingly, Olson does not have a constitutionally protected property interest in his continued employment with the county or in any of the benefits that came with it.

While Olson cites a litany of other potential benefits that his termination somehow caused him to miss out on (e.g., social security and legal claims), he has failed to allege that

---

[19] While Olson also suggests that this provision for a severance somehow made his employment terminable for cause, the requirement for severance pay does not change or eliminate the county's ability to terminate Olson at any time for any reason, provided the county offered him the severance in exchange for a release of claims, which the county did in Olson's case. *See Vorwald v. Sch. Dist. of River Falls*, 167 Wis. 2d 549, 557, 482 N.W.2d 93, 96 (1992) ("Under Wisconsin law, employment at will is the rule . . . a municipal employee is an employee at will and has no property interest in employment."). Olson's other arguments concerning his rights under the employment contract and the legality of his suspension are issues more appropriately raised as part of a breach of contract claim, which Olson must bring in state court for the reasons explained below.

he had any plausible *entitlement* or actual claim to these benefits.[20]   *See Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972) ("[T]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it.").

Finally, to the extent that Olson also seeks to bring a procedural due process claim for the deprivation of his personal office items, that claim fails as well.  Indeed, Olson has an adequate, obvious and available post-deprivation remedy in the form of state law claims for conversion, the recovery of personal property under Wis. Stat. § 893.35, the wrongful taking of or damage to property under Wis. Stat. §§ 893.51 and 893.52, and the request to the return of seized property under Wis. Stat. § 968.20(1), none of which he appears to have pursued.[21]   *See Parratt v. Taylor*, 451 U.S. 527, 541 (1981) (holding that loss of property by state officials does not present cognizable due process claim when state tort remedies provided adequate relief for the deprivation), *overruled in part on other grounds, Daniels v. Williams*, 474 U.S. 327 (1986); *see also Hudson v. Palmer*, 468 U.S. 517, 533 (1984) (holding reasoning in *Parratt* applies to intentional as well as negligent deprivations

---

[20] Specifically, Olson seems to be alleging that his termination deprived him of "five more years of work" to the retirement age of 67 and the additional financial security and benefits he would have received had he worked longer.  (Dkt. #62, at ¶ 343.)  However, because Olson had no property interest in continued employment, he also lacks a property interest in any benefits he *expected* to receive had he continued to work for the county.

[21] Olson's separate allegation that defendants unlawfully seized his property in violation of the Fourth Amendment is discussed below.

of property); *Derge v. Reynolds*, No. 15-cv-129-wmc, 2015 WL 902010, at *2 (W.D. Wis. Mar. 3, 2015) (citing *Hudson* and *Parratt* for same).

### b. Occupational Liberty

The Fourteenth Amendment protects a person's right or liberty to pursue a trade, profession, or other calling of choice. *Lawson v. Sheriff of Tippecanoe Cty., Ind.*, 725 F.2d 1136, 1138 (7th Cir. 1984). However, that liberty interest is impinged only when someone's "good name, reputation, honor or integrity [are] called into question in a manner that makes it virtually impossible for [the person] to find new employment in his chosen field." *Townsend v. Vallas*, 256 F.3d 661, 670 (7th Cir. 2001) (emphasis added). To state a due process claim based on the deprivation of occupational liberty (sometimes referred to as "a stigma plus theory"), Olson must allege facts showing that: (1) defendants made stigmatizing comments about him; (2) those comments were publicly disclosed; and (3) he suffered a tangible loss of other employment opportunities as a result of the public disclosure. *Palka*, 623 F.3d at 454.

As a threshold matter, the alleged stigmatizing statements must be "uttered incident to the termination." *Goecks v. Pedley*, 732 F. Supp. 2d 828, 832-33 (W.D. Wis. 2010), *aff'd,* 437 F. App'x 505 (7th Cir. 2011) (citing *Siegert v. Gilley*, 500 U.S. 226, 234 (1991); *Paul v. Davis*, 424 U.S. 693, 710 (1976) ("defamation had to occur in the course of the *termination* of employment")); *see also Lawson*, 725 F.2d at 1139 ("[T]he cases make clear that there is no deprivation of liberty if the employee is not fired."). Olson alleges that various defendants "smeared" him in their communications with each other during the months leading up to his termination, especially around the time of his suspension.

36

However, the alleged internal communications among the county supervisors and their insurers appear to have taken place *months* before Olson was terminated, meaning they could not plausibly be found to have been incident to his termination, particularly given Olson's numerous, intervening actions that plainly precipitated his suspension and eventual termination.

Moreover, Olson's allegations do not support an inference that the allegedly stigmatizing letters and emails were made public.  Indeed, Olson alleges that at the time of his termination, the new county board chairman, defendant McCumber, "told a newspaper reporter that the County Board did *not* need any reason(s) for the termination" and "stated publicly that the County Board did *not* have cause to discharge Mr. Olson."  (Dkt. #62 at ¶¶ 324 and 446 (emphasis added).)  There can be no deprivation of occupational liberty relating to the discharge of an at-will public employee "when there is no public disclosure of the reasons for the discharge," *Bishop v. Wood*, 426 U.S. 341, 348 (1976), and Olson has not alleged that the county publicly disclosed the reasons for his discharge, apart from his allegation that the county merely announced that the Lighthouse investigation had been completed.

Further, Olson has not refuted defendants' independent argument that he has failed to plausibly allege any tangible loss of other employment opportunities as a direct result of these allegedly stigmatizing comments.  In fact, Olson alleges that the county terminated his employment "just as Covid 19 turned the economy upside down," and "[t]here were no comparable jobs available" because "[n]obody was hiring anybody."  (Dkt. #62, at ¶ 342.)  Of course, Olson cites no legal authority for the proposition that he had a liberty

interest in a favorable job economy or a better or more lucrative position.  Instead, the Seventh Circuit has "consistently drawn a distinction . . . between occupational liberty and the right to a specific job."  *Wroblewski v. City of Washburn*, 965 F.2d 452, 455 (7th Cir. 1992).  "It is the liberty to pursue a calling or occupation, and not the right to a specific job, that is secured by the Fourteenth Amendment."  *Hinkle v. White*, 793 F.3d 764, 767 (7th Cir. 2015) (emphasis added); *see also Wroblewski*, 965 F.2d at 455 ("being a police officer is an occupation; being a police lieutenant is not") (citation omitted); *Bigby v. City of Chicago*, 766 F.2d 1053, 1057 (7th Cir. 1985) ("[R]anks within an occupation -- head nurse versus rank-and-file nurse, for example -- are not 'occupations' themselves; and while preventing someone from advancing in his occupation can be a cruel deprivation, it would stretch the idea of liberty of occupation awfully far, it seems to us, to treat a bar to promotion as a deprivation of that liberty.").

Thus, while Olson alleges that he was forced to retire (dkt. #62, at ¶ 343), he does not allege that he could no longer work as a lawyer because no one would hire him based on what was publicly published about him, and he does not argue in his response brief that this was the case.  Nor do the allegations in his amended complaint support such an inference.  Therefore, for all of these reasons, Olson has failed to state a claim for the deprivation of occupational liberty.

### 5.  Substantive Due Process

Next, to allege a viable substantive due process claim, a plaintiff must allege conduct under color of state law that "violated a fundamental right or liberty" and was so "arbitrary and irrational" as to "shock the conscience."  *Nelson v. City of Chicago*, 992 F.3d 599, 604

(7th Cir. 2021) (internal citations omitted).  While Olson bases his substantive due process claim on defendants' alleged "criminal plan" to destroy his employment relationship with the county, substantive due process claims are limited to violations of more fundamental rights.  In particular, employment-related rights are *not* considered fundamental, especially so here having found that Olson had no protected interest in his employment.  *Id*.; *Palka v. Shelton*, 623 F.3d 447, 453 (7th Cir. 2010) (citing *Belcher v. Norton*, 497 F.3d 742, 753 (7th Cir. 2007)).

Of course, the Due Process Clause protects citizens from abuses of power by executive officials, but "[t]he threshold for this kind of due-process claim is high; [and] many forms of governmental misconduct are excluded."  *Palka*, 623 F.3d at 454.  Thus, even Olson's allegations of a "smear campaign" against him do not rise to the level of conscience-shocking official misconduct, as further discussed in conjunction with the analysis of Olson's allegations of RICO violations.  *Id*. (citing *Tun v. Whitticker*, 398 F.3d 899, 903 (7th Cir. 2005) ("It is one thing to say that officials acted badly, even tortiously, but -- and this is the essential point -- it is quite another to say that their actions rise to the level of a constitutional violation."); *Kernats v. O'Sullivan*, 35 F.3d 1171, 1175 (7th Cir. 1994) ("Of course, every official abuse of power, even if unreasonable, unjustified, or outrageous, does not rise to the level of a federal constitutional deprivation.")).  Finally, a violation does not occur simply because a local unit of government violates state or local law.  *See Taake v. Cty. of Monroe*, 530 F.3d 538, 541 (7th Cir. 2008).  Accordingly, Olson has also failed to state a substantive due process claim.

### 6. Fourth Amendment

Olson's penultimate claim is that defendants violated his rights under the Fourth Amendment during his suspension by seizing his personal property from his office, which he alleges was guarded by armed sheriff's deputies.  As an initial matter, Olson admits that defendant Deitrich told him to contact Bolin if he needed to access anything from his office.  Even if this court were to credit Olson's further allegations that the offer was not "genuine" given Bolin's alleged participation in earlier attacks on Olson (dkt. #62, at ¶ 297), such warrant and probable cause requirements do not apply to workplace searches and seizures, which instead are analyzed under a reasonableness standard.  *O'Connor v. Ortega*, 480 U.S. 709, 719-26 (1987); *Shields v. Burge*, 874 F.2d 1201, 1203-04 (7th Cir. 1989).  To that end, a public workplace search and seizure is considered reasonable if it is "justified at its inception," such as where "there are reasonable grounds to believe that the search will uncover evidence of the employee's misconduct," and if it is "reasonably related in scope to the circumstances that prompted" it, *Kirk v. City of Kokomo*, 772 F. Supp. 2d 983, 990 (S.D. Ind. 2011) (quoting *Ortega*, 480 U.S. at 726), which has been construed to mean "not overly intrusive in light of the nature of the alleged misconduct," *Gossmeyer v. McDonald*, 128 F.3d 481, 491 (7th Cir. 1997).  Regardless, Olson does *not* claim that defendants searched his office or personal property.

At most, Olson alleges that defendants "seized" his belongings subsequent to the county board's vote to suspend him for possible misconduct as part of the Lighthouse complaints investigation.  As for this narrow claim, federal courts have generally held that the discharge or suspension of an employee greatly reduces, if not eliminates, his reasonable

expectation of privacy in his former workplace.  *See Shaul v. Cherry Valley-Springfield Cent. Sch. Dist.*, 363 F.3d 177, 184 (2d Cir. 2004) (teacher's reasonable expectation of privacy in personal property maintained in his classroom ended when he was suspended for professional misconduct and barred from his classroom); *see also Francis v. Giacomelli*, 588 F.3d 186, 195 (4th Cir. 2009) (Holding, in context of mayor firing police commissioner and deputies, that "it is common practice for an employer to take the employer's property away from discharged employees and to deny them access to the place of employment."); *Lee v. City of Chicago*, 330 F.3d 456, 461-65 (7th Cir. 2003) (holding that plaintiff could not bring Fourth Amendment unreasonable seizure claim challenging conditions imposed on the property's return where property had been lawfully seized by government, although other legal remedies for return might be available).

Accordingly, it is not plausible that barring Olson from his office and depriving him temporary access to some of his personal property was overly intrusive given that: (1) he had just been suspended pending the investigation of possible misconduct; and (2) he was at least told that he could make arrangements to claim his property.  And while Olson also argues the board did not have the authority to suspend him, "that fact does not change the Fourth Amendment analysis." *Francis*, 588 F.3d at 195 (rejecting same argument in public employment context).  Thus, Olson fails to state a Fourth Amendment claim with respect to the seizure of his property.

### 7. Conspiracy and Monell Claims

Finally, Olson cannot assert a conspiracy or *Monell* claim under § 1983 without showing another underlying constitutional violation, so those claims must be dismissed as

well.  *See First Midwest Bank Guardian of Estate of LaPorta v. City of Chicago*, 988 F.3d 978, 986-87 (7th Cir. 2021); *Daugherty v. Page*, 906 F.3d 606, 612 (7th Cir. 2018).

## C.   Remaining State Law Claims

Because Olson's federal RICO and § 1983 claims provide the *only* alleged basis for this court's exercise of subject matter jurisdiction, and complete diversity among plaintiffs and defendants is obviously lacking, a necessary, remaining question is whether this court should continue to exercise supplemental jurisdiction over any of Olson's remaining state law claims.  *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction . . . if . . . the district court has dismissed all claims over which it had original jurisdiction.").  "[T]he general rule is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits."  *Davis v. Cook Cty.*, 534 F.3d 650, 654 (7th Cir. 2008) (quoting *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1251 (7th Cir. 1994)) (alteration in original).  Seeing no reason to do otherwise here, the court will decline to consider any possible remaining state law claims and dismiss those claims without prejudice and with leave to file them, as appropriate, in state court, subject to any applicable statute of limitations.

ORDER

IT IS ORDERED that:

1) Plaintiff Daniel Olson's motion for an extension of time to file a reply brief (dkt. #129) is GRANTED.

2) Plaintiff's motion to disqualify counsel for the county and insurance defendants (dkt. #103) is DENIED.

3) Defendants' motions to dismiss (dkt. ##81, 89, and 92) are GRANTED.

    a. All of plaintiff's RICO and 42 U.S.C. § 1983 claims are DISMISSED.

    b. Plaintiff's potential state law claims are DISMISSED WITHOUT PREJUDICE.

4) Plaintiff's motion to protect ESI evidence (dkt. #138), motion for extension of time to file his reply to the discovery motion (dkt. #150), motion to substitute a party (dkt. #156), motion for sanctions (dkt. #165), and motion for hearing (dkt. #170) are DENIED as moot.

5) The clerk of court is directed to enter judgement for defendants and close this case.

Entered this 2nd day of July, 2024.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge

43